UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

LUIS CARRASQUILLO,

                Plaintiff,

    v.

COMMISSIONER OF SOCIAL
SECURITY,

                Defendant.

**<u>MEMORANDUM & ORDER</u>**

23-CV-02323 (NRM)

NINA R. MORRISON, United States District Judge:

      Plaintiff Luis Carrasquillo ("Plaintiff") brings this action under 42 U.S.C. § 405(g) seeking judicial review of the Social Security Administration's ("SSA") denial of his claim for a period of disability and Disability Insurance Benefits ("DIB"). Plaintiff argues that the Administrative Law Judge's ("ALJ") decision is not supported by substantial evidence and does not properly apply the relevant legal standards. Specifically, Plaintiff challenges the ALJ's conclusion that he retains the residual functional capacity to resume his past relevant work as a financial crimes detective. Plaintiff also argues the ALJ erred by failing to clarify Plaintiff's physical limitations by either recontacting the consultative medical examiner or ordering a new consultative examination.

The parties have cross-moved for judgment on the pleadings. ECF No. 8-1, 10-1. Plaintiff seeks reversal of the Commissioner's decision and remand for a new administrative hearing. The Commissioner moved to affirm its decision and dismiss Plaintiff's action. For the reasons set forth below, the Court GRANTS Plaintiff's motion for judgement on the pleadings and denies the Commissioner's motion. The case is remanded to the original ALJ for further proceedings consistent with this ORDER.

## **BACKGROUND**

### I.     **Procedural History**

On March 17, 2020, Plaintiff filed a Title II application for a period of disability and DIB, alleging a disability onset date of February 12, 2020. *See* Certified Administrative Record ("A.R.") 13, 204–10, ECF No. 6.[1] This claim was denied initially on December 8, 2020, A.R. 89, and was denied again on reconsideration on June 14, 2021, A.R. 101. Plaintiff then filed a written request for a hearing before an ALJ on July 2, 2021. A.R. 113–14.

On February 3, 2022, ALJ Dina Loewy held a telephone hearing. A.R. 30. Plaintiff was present at the hearing and was represented by counsel. A.R. 30 By decision dated June 1, 2022, the ALJ found that Plaintiff was not disabled for the purposes of disability and DIB under § 216(i) and § 223(d) of the Social Security Act. A.R. 25.

---

[1] Citations to the Administrative Record refer to the internal pagination, not the pagination generated by the Electronic Case Filing system.

Subsequently, Plaintiff filed an appeal with the Appeals Council on June 8, 2022. A.R. 202. On March 17, 2023, the Appeals Council denied Plaintiff's request for review, and the ALJ's decision became the final decision of the Commissioner. A.R. 1–5.

On March 27, 2023, Plaintiff commenced this action. ECF No. 1. On June 26, 2023, Plaintiff moved for a judgment on the pleadings, seeking vacatur and remand of the ALJ's decision. ECF No. 8-1, Plaintiff Motion ("P. Mot."), at 1, 16. The Commissioner then cross-moved for judgment on the pleadings, seeking affirmation of its final decision that Plaintiff was not entitled to DIB payments. ECF No. 10-1, Defendant Motion ("D. Mot.") at 1, 28.

## II.    Plaintiff's Claimed Disability

Plaintiff claims that he has a spinal cyst (syringomyelia) which has caused a lack of feeling in parts of his body. P. Mot. at 3–4. He argues that he has marked trouble walking, sitting for long periods of time, lifting items over 5 pounds, typing, and writing. *Id.* Because of his alleged disability, he contends that he was not able to work his job as a financial crimes investigator in the NYPD. *Id.*

## III.    Medical Records

The administrative record included treatment notes and other records from Plaintiff's medical providers; their findings as relevant to Plaintiff's claimed disability are summarized here.

## A.  Dr. Alexander Gecht

Plaintiff's general practitioner, Dr. Alexander Gecht, provided treatment notes dating from February 2018 to May 2020.  A.R. 324–61.  Plaintiff visited Dr. Gecht six times before his alleged disability onset date of February 12, 2020.  A.R. 324–61. During his first visit, in February 2018, Plaintiff complained of back and right leg pain, A.R. 356–61; during his second visit in May 2018, Plaintiff again complained of back pain and also apneic events but did not complain of any leg pain, A.R. 351–56; during his third visit, an annual physical in May 2019, Plaintiff again complained of lower back pain and apneic events, but his systems were observed to be generally normal, A.R. 345–50; during his fourth visit, one week later in June 2019, a hernia exam showed right and left inguinal hernias present, so Plaintiff was referred to a specialist for an inguinal hernia repair, A.R. 340–44; during his fifth visit, in November 2019, Plaintiff complained of "weight gain/obesity" and apneic events, but his systems were observed to be generally normal and he denied suffering from any pain, A.R. 335–39; during his sixth visit, in December 2019, Plaintiff complained of hypertension, hyperlipidemia, and diabetes mellitus type 2, but his remaining systems were observed to be normal and he denied suffering from any pain, A.R. 329– 34.  Finally, Plaintiff had a telehealth call with Dr. Gecht in May 2020, the first visit since his alleged disability onset date of February 12, 2020, where he reported suffering from a headache for the last five days and experiencing moderate back and limb pain.  A.R. 324–27.  Dr. Gecht instructed Plaintiff to diet, exercise, and increase his medication (Lisinopril).  A.R. 326.

**B. Dr. Dany Elsayegh**

Plaintiff saw pulmonologist Dr. Dany Elsayegh on three occasions between June 2019 and December 2019. A.R. 308–14. Following a sleep study, Plaintiff was advised to use a continuous positive air pressure ("CPAP") machine to alleviate his severe obstructive sleep apnea. A.R. 312, 315–16. In December 2019, Plaintiff reported that he was using and benefiting from the CPAP machine. A.R. 313–14. Nearly eighteen months later, in May 2021 — more than a year after Plaintiff's disability onset date — Plaintiff spoke with Dr. Elsayegh during a follow-up telehealth call where Plaintiff again reported using and benefiting from the CPAP machine, but he also reported suffering from mild intermittent asthma, neck pain, leg weakness, obesity, hypertension, a non-recurrent unilateral inguinal hernia, sleep apnea, syrinx, and right upper extremity weakness. A.R. 442. Plaintiff was advised to continue using his CPAP machine and to attempt losing weight. A.R. 442. Plaintiff had a second telehealth call with Dr. Elsayegh in January 2022 where he reported suffering from the same problems and was given the same advice. A.R. 430.

**C. Dr. Michael Castellano**

In July 2019, Plaintiff underwent surgery to repair his bilateral inguinal hernias. A.R. 387–95. Following the successful surgery, Plaintiff's medical surgeon, Dr. Michael Castellano, advised him to avoid any heavy lifting or strenuous activity for several weeks. A.R. 367, 387.

**D. Dr. Yasir El-Sherif**

Plaintiff visited his neurologist, Dr. Yasir El-Sherif, for a follow-up visit in October 2019, where he reported neck pain, weakness and a burning sensation in his right arm, and weakness in his right leg with no difficulty walking but pain with prolonged standing. A.R. 303. Following a neurological exam, Dr. El-Sherif observed Plaintiff with right arm weakness (4+/5), decreased vibration in his right arm, and decreased temperature in his right face, arm, and leg. A.R. 303. Plaintiff was diagnosed with cervicalgia, traumatic syrinx,[2] and was advised to continue his dosage of Amitriptyline, increase his dosage of Gabapentin, and undergo a magnetic resonance imaging (MRI) of his cervical and thoracic spine. A.R. 304.

In April 2020, two months after his alleged disability onset date, Plaintiff had a telehealth call where he and Dr. El-Sherif discussed how, despite his continuing neck pain, the December 2019 MRI showed his syrinx was stable.[3] A.R. 320. Plaintiff

---

[2] In February 2010, prior to the relevant period, Plaintiff was diagnosed with syringomyelia involving the distal cervical spinal cord and upper thoracic spinal cord. A.R. 378. "Syringomyelia is a neurological disorder in which a fluid-filled cyst (syrinx) forms within the spinal cord. The syrinx can get big enough to damage the spinal cord and compress and injure the nerve fibers that carry information to and from the brain to the body." *Syringomyelia*, Nat'l Inst. of Neurological Disorders and Stroke, https://www.ninds.nih.gov/health-information/disorders/syringomyelia (last visited Aug. 6, 2025).

[3] The Administrative Record also includes the results from Plaintiff's December 2019 MRI of his cervical spine and thoracic spine. A.R. 397–414. Though the images were motion degraded, the cervical spine MRI results showed: (1) mild cervical spondylosis without significant canal or foraminal narrowing; (2) no cord compression; and (3) "[p]reviously seen cord syrinx extending to the C5 level now is only more conspicuous starting around C7 level, unclear if this is due to motion or overall decreased size of syrinx." A.R. 400. MRI results of the thoracic spine showed: "[d]ecreased cord expansion and size of previously characterized distal cervical/upper thoracic cord syrinx"; "[n]o new cord signal abnormality allowing for motion"; and "[n]o cord compression or significant canal stenosis in the thoracic spine." A.R. 400.

reported that lately he was experiencing more pain and numbness going down his arm, but the Gabapentin was lessening these symptoms significantly.  A.R. 320. Plaintiff also reported that he was having a lot of stress due to the COVID-19 pandemic and to being at home watching his 4-year-old son every day while his wife worked, but he indicated he was closing on a house in Florida where he planned to live for most of the year.  A.R. 320.

On June 29, 2021, Plaintiff had a telehealth videocall with Dr. El-Sherif where Plaintiff reported that, over the last few months, he had been experiencing daily gait imbalance and increasing pain in his neck and extremities.  A.R. 441.  Plaintiff also reported feeling a burning sensation down his arm and indicated he was experiencing no difficulty with walking, only right leg pain with prolonged standing.  A.R. 441. Although Dr. El-Sherif found it difficult to assess Plaintiff's gait because they were meeting over video, he did note that Plaintiff's gait seemed wide, and he assessed that it may be due to expansion of Plaintiff's syrinx or another central cause.  A.R. 441.  Dr. El-Sherif ordered an MRI of Plaintiff's brain and cervical spine.  A.R. 441.

## IV.    Medical Evaluations

Three doctors provided the ALJ with their evaluations of Plaintiff's medical conditions as related to his claimed disability.  Only one of these doctors, Dr. Silvia Aguiar, actually examined Plaintiff for this purpose.  The other doctors' opinions are based on an analysis of his records.

### A.  Dr. Silvia Aguiar's First Examination

On November 16, 2020, Plaintiff attended a consultative examination with Dr. Silvia Aguiar. A.R. 416–20. Dr. Aguiar listed Plaintiff's chief complaints to be neck pain, upper back pain, right upper extremity pain, hypertension, asthma, and prediabetes. A.R. 416. Dr. Aguiar also noted that Plaintiff reported "persistent pain on the upper back, neck and right upper extremity all the way down to the fingers of the right hand[,] . . . severe imbalance on walking[,] . . . [and] a history of falls [including] . . . in 2010 [when] he fell at work and most recently approximately one month ago [when] he fell when walking on the street with his family." A.R. 416. Plaintiff reported that his daily activities were limited because "[h]is girlfriend does all the activities of daily living," except he did report showering daily, dressing himself daily, watching TV, and listening to the radio. A.R. 417. Upon physical examination, Dr. Aguiar found Plaintiff had a normal gait, appeared to be in no acute distress, and used no assistive devices. A.R. 417. Dr. Aguiar also noted that Plaintiff had an ability to rise from his chair without difficulty, walk on his heels and toes without difficulty, complete a full squat, and change his clothing and get on and off the exam table without help. A.R. 417. Dr. Aguiar's musculoskeletal exam revealed Plaintiff had reduced range of motion in his cervical spine and shoulders, no scoliosis, kyphosis, or abnormality in his thoracic spine, full range of motion in his lumbar spine, a straight leg test at 10 degrees on his right and negative on his left, and full range of motion bilaterally in his elbows, forearms, wrists, hips, knees, and ankles. A.R. 418. Upon neurological examination, Dr. Aguiar found full strength in Plaintiff's upper and lower extremities. A.R. 418–19. However, Dr. Aguiar noted a sensory

deficit on Plaintiff's right side, including his fingers and lower extremity, all the way down to his right foot and toes. A.R. 418–19. Examination of Plaintiff's extremities was negative for cyanosis, clubbing, edema, significant varicosities, significant trophic changes, and muscle atrophy evidence. A.R. 419. Dr. Aguiar found Plaintiff's hand and finger dexterity to be intact, his grip strength to be a 4/5 on the right and 5/5 on the left; Dr. Aguiar also noted that Plaintiff was able to zip, button, and tie. A.R. 419.

Dr. Aguiar diagnosed Plaintiff with the following conditions: upper back pain; neck pain; right upper extremity pain; right hand and finger pain; imbalance; history of asthma; prediabetes history; and hypertension. A.R. 419. Importantly, Dr. Aguiar opined that Plaintiff had "marked limitations" for performing "activities that require grasping, holding, and handling objects with the right hand, heavy lifting, carrying, pushing, and pulling with the upper extremities bilaterally;" and also "marked limitations" when experiencing "prolonged standing, prolonged walking, climbing stairs, kneeling, and crouching." A.R. 419. Dr. Aguiar advised that Plaintiff should "avoid any positional activities that require balance due to history of frequent falls." A.R. 419.

**B. Dr. V. Cincore**

On December 2, 2020, a non-examining State agency medical consultant, Dr. V. Cincore, reviewed the available records and concluded that Plaintiff suffered from three severe impairments: (1) DDD (Disorders of Back-Discogenic and Degenerative); (2) Essential hypertension; and (3) Migraines. A.R. 57. However, Dr. Cincore opined

that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms" were "generally not consistent with the evidence of record." A.R. 58. Dr. Cincore concluded that Plaintiff had the physical capacity to: occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand/walk or sit for about 6 hours in an 8-hour workday with normal breaks; occasionally push/pull on the right side due to Syringomyelia with marked neuropathy; and occasionally climb ramps/stairs, ladders/ropes/scaffolds, balance, stoop, kneel, crouch, and crawl. A.R. 59–60. As to Plaintiff's manipulative limitations, Dr. Cincore found that Plaintiff had reaching limitations on his right side, including being able to only occasionally reach overhead due to a decreased range of motion in the right upper extremity. A.R. 61. Dr. Cincore also noted limitations on Plaintiff's right side with reaching "in front and/or laterally" but no limitations for "handling," "fingering," and "feeling." A.R. 61.

Regarding Dr. Aguiar's opinion from November 16, 2020, Dr. Cincore stated that it was "not inconsistent with medical findings," but "does limit the claimant further than the preponderance of the medical evidence suggests" and was "without substantial support . . . which renders it less persuasive." A.R. 59, 63.

## C. Dr. Silvia Aguiar's Second Examination

On May 26, 2021, Plaintiff visited Dr. Aguiar for a second consultative examination. A.R. 423–427. Although much of the findings were the same, there were a few notable changes. Plaintiff's chief complaints changed slightly from the previous visit. Plaintiff now reported suffering from lower back pain instead of upper back pain, as well as GERD, hypertension, and dizziness, and he no longer

10

complained of prediabetes, neck pain, or upper extremity pain. A.R. 423; *see* A.R. 416. Dr. Aguiar found Plaintiff's physical examinations were largely the same, except this time he was found to have a reduced squat (1/4) and a reduced range of motion in his lumbar spine. A.R. 424–25; *see* A.R. 417–18. Additionally, Dr. Aguiar's second report indicated that Plaintiff had full grip strength in both hands, and no longer had any sensory deficit on his right side — where Dr. Aguiar had previously noted sensory deficits in Plaintiff's fingers and all the way down his lower extremity. A.R. 425–26; *see* A.R. 418–19.

For the first time, during the second examination, Dr. Aguiar diagnosed Plaintiff with lower back pain (where previously she had only diagnosed upper back pain), GERD, asthma, obstructive sleep apnea, hypertension, and dizziness. A.R. 426. Diagnoses present during the first examination but not the second examination were: neck pain; right upper extremity pain; right hand and finger pain; imbalance; and prediabetes history. *See* A.R. 419.

Dr. Aguiar's opinions as to Plaintiff's physical limitations also changed to some degree. During this examination, Dr. Aguiar found Plaintiff to have "marked limitations" for "bending" and for "prolonged sitting," after not noting any limitations during the last examination. A.R. 426, 419. Additionally, during this examination, Dr. Aguiar stated that Plaintiff had a "moderate limitation" for "reaching overhead," after not noting any limitation during the last examination, and a "moderate limitation" for "pushing and pulling with the upper extremities bilaterally," after previously opining Plaintiff had a "marked limitation" in this area. A.R. 426, 419.

11

Plaintiff was also advised, for the first time, to "avoid smoke, dust, respiratory irritants, and other known respiratory allergens due to history of asthma." A.R. 426.

Notably, Dr. Aguiar no longer listed Plaintiff to have any limitation for the following: "activities that require grasping, holding, and handling objects with the right hand"; "climbing stairs"; or "kneeling." A.R. 419, 426. Plaintiff was still listed to have "marked limitations" for "heavy lifting," "carrying," "prolonged standing, prolonged walking, [and], prolonged crouching;" and he was once again advised to "avoid positional activities that require balance." A.R. 419, 426.

### D. Dr. R. Pradhan

On June 10, 2021, a second non-examining State agency medical consultant, Dr. Pradhan, reviewed the available records, including the updated reports occurring after Dr. Cincore's December 2020 findings. A.R. 68–80. The updated reports included the findings from Plaintiff's second consultative examination with Dr. Aguiar on May 26, 2021. Dr. Pradhan affirmed Dr. Cincore's findings. A.R. 75. However, Dr. Pradhan additionally concluded that Plaintiff no longer possessed any manipulative limitations. A.R. 78.

## V.    Plaintiff's Testimony at the Hearing

Plaintiff testified at the SSA hearing on February 3, 2022. Regarding his job duties, he stated that he primarily investigated financial crime cases and that, during an eight-hour workday, he would sit for six or seven hours, walk for about an hour, and lift no more than ten pounds at a time. A.R. 36. He also testified that his typical

"daily activities" included watching TV, reading, and taking care of his 5-year-old son — which he described as "hard work." A.R. 37.

Plaintiff also testified as to his symptoms and physical limitations. A.R. 37–42. When asked why he felt unable to work anymore, Plaintiff testified that, following his surgery in 2010, he had experienced worsening symptoms due to a cyst on his upper spine which had resulted in him being able to do "less and less," caused him "all kinds of pain," required him to take medication that makes him very sleepy, and caused sensory deficit to his right side. A.R. 37–38. When asked by the ALJ to focus on the period of time no more than one year prior to his February 2020 disability onset date, he testified as to the following:

> [The sensory deficit was] getting worse . . . to the point that I could get — to the point where I can get stabbed or cut or anything like that I wouldn't even feel it, I mean — which has happened where I cut my hand or my arm. And to the point as well as I also have fallen on the floor trying to go downstairs because I don't — you know, I just don't feel my leg coming down. It comes down but I don't — you know, the sensation kind of pain. Basically, it's mostly — I mean, the sensation I lost I get burning sensation as well because it's basically that's a nerve condition that I get like these tingling sensations. Sometimes I feel like — I don't know if this ever happened to you, but if you're walking down the street and you're looking another way and you run into a pole, it feels like your head is like cartoons where when that happens your head shakes or the person shakes. That's how I — I feel like that sometimes, too. The medication basically it deals with it but not to the point where it takes it away. I've tripped while walking down the street. I could walk down the street or I can be walking and my eyes start drifting to the left. And these are like some of the symptoms, besides the, you know, besides the pain and the sensation that comes with this having the cyst on my spine, which is my upper spine. And a lot of it comes from the operation itself, too, because I mean instead of getting better I got worse.

A.R. 38–39.

13

Plaintiff also testified that he could walk for only "like two, not even two blocks," stand for "maybe close to a half an hour, something like that, maybe less," and sit for "maybe half an hour," before lying down because the pressure on his back becomes "unbearable." A.R. 40–41. Plaintiff also testified that he could lift or carry "maybe five pounds." A.R. 41. Upon questioning from his attorney, Plaintiff testified that the numbness and tingling in his right arm causes him difficulty with typing and writing. A.R. 42.

## VI.    The Vocational Expert

A vocational expert ("VE"), Sheri Pruitt, also testified at the hearing as to Plaintiff's job requirements. A.R. 42–49. She testified that Plaintiff's prior employment with the New York Police Department was classified as "detective, DOT code 375.267-010, as defined by the DOT this is a light job, it was performed at the sedentary level, and has an SVP of 7." A.R. 45. The "DOT" refers to the "Dictionary of Occupational Titles," and the "SVP" refers to the "Specific Vocational Preparation." An SVP of 7 is considered a "light" exertion level. A.R. 24.

The ALJ asked Pruitt a hypothetical focused on a claimant with the same vocational factors (age, education, and work experience) as Plaintiff. A.R. 45:

> I'm going to ask you to assume that he can do sedentary work with occasionally lifting and/or carrying ten pounds, frequently less than ten pounds, walking one hour in an eight-hour workday with normal breaks, standing one hour in an eight-hour workday with normal breaks, sitting six hours in an eight-hour workday with normal breaks. Occasionally climbing ramps or stairs, never climbing ladders, ropes, or scaffolds, no balancing on uneven surfaces, no more than occasional stooping, never kneeling, crouching, or crawling, frequently reaching, handling or fingering with the right upper extremity, occasional right overhead reaching. Avoid even moderate exposure to hazardous machinery,

14

unprotected heights, and operational control of moving machinery, moderate noise level.

A.R. 45–46.

In response, Pruitt said that this hypothetical claimant could complete the past relevant work "as performed." A.R. 46. Pruitt further agreed that this hypothetical claimant could perform the work "as performed" even if limited to "no more than occasional push/pull with the upper extremities." A.R. 46. Next, Plaintiff's counsel asked Pruitt if the same hypothetical claimant could perform their past relevant work "as performed" if they were also limited to only occasional use of their right hand for all manipulative tasks. A.R. 47. Pruitt replied that this hypothetical claimant "could not perform the past work neither as it was performed or as it's performed generally." A.R. 47–48.

Finally, the ALJ asked the VE if the same hypothetical claimant could perform their same past relevant work if it was limited to "light work" (instead of sedentary work), with lesser limitations for "lifting and/or carrying" of "20 pounds occasionally and less than 10 pounds frequently" (instead of 10 occasionally and less than ten pounds frequently), and with the additional limitation of only "occasional use of the right hand for all manipulation." A.R. 48. In response, Pruitt said that "[b]ecause of the occasional use of the hands," the hypothetical claimant could *not* do their past relevant work. Explaining her reasoning, Pruitt stated: "the DOT does say that it requires occasional reaching, handling, and fingering but in my experience and from what I've observed of the job being performed, especially with computers nowadays it would require at least frequent reaching, handling, and fingering." A.R. 48.

15

After Pruitt concluded her testimony, Plaintiff's counsel requested that the ALJ order an additional consultative examination of Plaintiff to further clarify Plaintiff's physical limitations, specifically citing uncertainty as to Plaintiff's ability to complete sedentary work with more than occasional use of the right hand.  A.R. 49–50.  The ALJ did not order the additional examination, and instead took counsel's request "under advisement."  A.R. 50.

## VII.    The ALJ's Decision

To be eligible for DIBs, a claimant must be found disabled within the meaning of the Social Security Act.  20 C.F.R. § 416.920; *see also* 20 C.F.R. § 416.905 (defining disability).  In determining whether a claimant is disabled under the Social Security Act, an ALJ must follow a five-step framework.  *Id.* § 416.920(a)(4); *see, e.g.*, *Thomas v. Comm'r of Soc. Sec.*, No. 20-CV-5086 (PKC), 2022 WL 523544, at *2 (E.D.N.Y. Feb. 22, 2022).

At step one, an ALJ considers the claimant's work activity.  If a claimant is "doing substantial gainful activity," an ALJ will find the claimant not disabled.  20 C.F.R. § 416.920(a)(4)(i).

At step two, an ALJ determines whether a claimant suffers from a "severe medically determinable physical or mental impairment."  *Id.* § 416.920(a)(4)(ii).  An impairment must meet the "duration requirement in § 416.909": Unless the "impairment is expected to result in death," the impairment "must have lasted or must be expected to last for a continuous period of at least 12 months."  *Id.* § 416.909.  If a claimant does not have an impairment or impairments that meets the duration

16

requirement, an ALJ will find the claimant not disabled. *Id.* § 416.920(a)(4)(ii). If the duration requirement is met, an ALJ proceeds to step three.

At step three, an ALJ determines whether a claimant's impairment "meets or equals" one of the impairments listed in appendix 1 to subpart P of part 404 of the Social Security Act (the "Listings"). *Id.* § 416.920(a)(4)(iii). If the impairment does, a claimant will be found disabled. *Id.* If a claimant's impairment "does not meet or equal a listed impairment," an ALJ must "assess and make a finding about [the claimant's] residual functional capacity." *Id.* § 416.920(e).

At step four, the residual functional capacity ("RFC") is considered in relation to claimant's "past relevant work." *Id.* § 416.920(a)(4)(iv). If a claimant is able to perform "past relevant work," they will be found not disabled. *Id.* If a claimant is unable to perform past relevant work, an ALJ proceeds to step five.

At step five, the RFC is considered along with the claimant's "age, education, and work experience" to determine whether the claimant can "make an adjustment to other work." *Id.* § 416.920(a)(4)(v). If a claimant "cannot make an adjustment to other work," the claimant will be found disabled. *Id.*

Here, the ALJ's analysis followed the five-step evaluation framework required by 20 C.F.R. § 416.920. At step one, the ALJ found Plaintiff had not engaged in substantial gainful activity since his alleged onset date of February 12, 2020. A.R. 16. At step two, the ALJ found Plaintiff's "ability to perform basic work activities" was limited by three severe impairments: (1) obesity; (2) syringomyelia; and (3) sleep apnea. A.R. 16. The ALJ also found that Plaintiff's additional diagnoses of

17

"cervicalgia, hyperlipidemia, hypertension, diabetes mellitus, asthma and inguinal hernia" were "non-severe medically determinable impairments because they have not caused more than a minimal effect on [his] ability to perform basic work activities." A.R. 17.

At step three, the ALJ determined that Plaintiff's impairments did not meet or medically equal the severity of one of the Listings. A.R. 17. At the onset, the ALJ found Plaintiff's "obesity, syringomyelia, and sleep apnea" do not exactly match a specific listing, and then found "the functional effects of these impairments do not equal any medical listing." A.R. 17. Still, the ALJ considered four Listings. A.R. 17. First, the ALJ considered Listing 1.15 ("Disorders of the skeletal spine resulting in compromise of a nerve root(s)") but found Plaintiff did not meet the criteria because he "does not have a documented medical need for an assistive device that involves the use of both hands or an inability to use an upper extremity for work-related activities involving fine and gross movements." A.R. 17. Second, the ALJ considered Listing 11.08 (spinal cord disorders) but found Plaintiff's syringomyelia did not meet the requirements of this listing either. A.R. 17. Last, the ALJ considered Listings 3.09 and 4.02 when assessing Plaintiff's sleep apnea before finding his condition did not meet "the requirements of these listings." A.R. 17. The ALJ also stated that, while reaching her conclusions, she considered the factors in SSR 19-2p. A.R. 18; *see* SSR 19-2p (addressing how ALJs should consider the impact of a claimant's obesity in disability claims).

After the ALJ concluded that Plaintiff's impairments did not meet or medically equal the impairments in the Listings, the ALJ then determined Plaintiff's RFC. A.R. 18. The ALJ found Plaintiff was able to perform "sedentary work" as defined in 20 CFR 404.1567(a):

> [T]he claimant can occasionally lift and/or carry 10 pounds, less than 10 pounds frequently. The claimant can walk 1 hour in an 8-hour workday with normal breaks and stand for 1 hour in an 8-hour workday with normal breaks. The claimant can sit 6 hours in an 8-hour workday with normal breaks. The claimant can occasionally climb ramps or stairs, but can never climb ladders, ropes, or scaffolds. The claimant can never balance on uneven surfaces. The claimant is limited to no more than occasionally stooping, but he can never kneel, crouch, or crawl. The claimant is limited to frequent reaching, handling, and fingering with his right upper extremity. The claimant is limited to occasional overhead reaching with his right upper extremity. The claimant must avoid even moderate exposure to hazardous machinery, unprotected heights, and operational control of moving machinery. The claimant is limited to a moderate noise level. The claimant is limited to no more than occasional push/pull with the upper extremities.

A.R. 18.

The ALJ focused on Dr. Aguiar's opinions that Plaintiff "had marked limitations with prolonged standing, prolonged walking, climbing stairs, kneeling, and crouching," and "a marked limitation with performing activities that require grasping, holding, and handling objects." A.R. 22. The ALJ found these opinions "unpersuasive because they are inconsistent with [Plaintiff's] consultative examination findings," as well as the "relatively benign physical findings of [Plaintiff's] treating providers." A.R. 22. The ALJ specifically then found Dr. Cincore and Dr. Pradhan's opinions, which were not based on physical examinations of Plaintiff, as "persuasive because [of] the totality of [Plaintiff's] impairments." A.R.

23. The ALJ also denied Plaintiff's request for a further consultative examination to resolve any inconsistencies because Dr. Aguiar's "opinion . . . is unsupported by [her] own clinical findings." A.R. 23.

Thus, at step four, the ALJ found that Plaintiff is not disabled because, at the time of the hearing, he was capable of performing past relevant work as a "Detective." A.R. 24. Under the DOT, the "detective" title is listed under code 375.267-010 and has an SVP of 7, which is considered a "light" exertion level. A.R. 24. However, the ALJ found that Plaintiff's past relevant work as a detective was actually performed at the sedentary exertion level. A.R. 24. Accordingly, the ALJ found Plaintiff was not capable of performing his past relevant work as a detective as it was *generally* performed in the national economy (at a light exertion level) but was capable of performing the job as he *actually* performed it (at a sedentary exertion level). A.R. 24. The ALJ found that Plaintiff's past work as a detective would "not require the performance of work-related activities precluded by the [Plaintiff's] residual functional capacity." A.R. 24. The ALJ reasoned:

> Although the claimant initially reported having to restrain unruly citizens and lifting as much as 100 pounds, he thereafter reported lifting no more than 10 pounds at his past relevant work (Ex. 2E/2, 6E/3). When questioned at the hearing regarding this discrepancy, he testified that he worked an office job at a desk, investigating financial crime cases. He testified that he sat for 6–7 hours, walked one hour, stood for one hour, lifted less than 10 pounds and did no crouching, stooping, kneeling, or crawling at this job.

A.R. 24.

The ALJ also found that the "vocational expert's statements are consistent with the information contained in the [DOT]." A.R. 24. Explaining that since the

DOT "does not consider the limitation of overhead reach, the vocational expert testified that she based her opinion on her professional experience . . . [and t]his explanation is reasonable and accepted in accordance with SSR 00-4p." A.R. 24.

Because the ALJ determined Plaintiff could perform past relevant work, the ALJ did not proceed to step five. *See* A.R. 24. The ALJ then concluded that Plaintiff was not disabled as defined under the Social Security Act from the alleged onset date of February 12, 2020 through the date of the ALJ's decision on June 1, 2022. A.R. 24–25.

## STANDARD OF REVIEW

In reviewing a final decision of the Commissioner of Social Security, the court must determine whether the Social Security Administration's conclusions were "supported by substantial evidence in the record and were based on a correct legal standard." *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (citation omitted). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schillo v. Kijakazi,* 31 F.4th 64, 74 (2d Cir. 2022) (citation omitted). In making the determination as to whether the Social Security Administration's findings are supported by substantial evidence, "the reviewing court is required to examine the entire record, including contradictory evidence." *Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam). "If there is substantial evidence to support the determination, it must be upheld." *Selian v. Astrue,* 708 F.3d 409, 417 (2d Cir. 2013) (citing *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009)).

## DISCUSSION

Plaintiff argues that the ALJ's decision was not supported by substantial evidence and did not properly apply the relevant legal standard. *See* P. Mot. at 10. Specifically, Plaintiff argues that the ALJ's finding at step four that Plaintiff was capable of "meeting the exertional and postural requirements of his past work" was "without evidentiary support." *Id.* at 11. Plaintiff asserts the ALJ erred when finding Plaintiff had the RFC for "frequent reaching, handling, and fingering with his right upper extremity." *Id.* at 15.

Plaintiff also argues that the ALJ erred when finding Dr. Aguiar's RFC assessment to be "unpersuasive" and "not supported" by the clinical findings or treatment records. He also challenges the ALJ's reliance on the opinions of non-examining State agency medical consultants, Drs. Cincore and Pradhan. *Id.* at 13–14. Last, Plaintiff asserts: "If the ALJ was genuinely concerned that Dr. Aguiar's RFC assessment was inconsistent with the clinical findings, she could have readily reached out to her for clarification. Alternatively, she could have ordered a consultative examination to be conducted by another physician or she might have obtained testimony of a physician to evalua[t]e [] the clinical evidence and to address Dr. Aguiar's RFC assessment." P. Mot. at 13–14. In response, the Commissioner argues that "substantial evidence supports the ALJ's findings" where (1) the ALJ "properly determined that the evidence failed to support limitations beyond those set forth in the RFC," (2) the ALJ properly evaluated and weighed the persuasiveness of

the medical opinions, and (3) the ALJ did not err by declining to seek clarification or additional information as to Plaintiff's RFC.  D. Mot. at 17–28.

For the reasons set forth below, the Court grants Plaintiff's motion and remands for further proceedings because the ALJ's decision was not supported by substantial evidence as the record was not adequately developed.

## I.    Medical Opinions

The ALJ reviewed medical source statements from three physicians: non-examining State Agency medical consultants Drs. Cincore and Pradhan, and consultative medical examiner Dr. Aguiar — who examined Plaintiff twice over a six-month period and submitted a report after each examination.

Because Plaintiff filed his application for DIB after March 27, 2017, "the ALJ's review of medical opinions was governed by 20 C.F.R. § 416.920c." *Wickham v. Comm'r of Soc. Sec.*, No. 24-2045, 2025 WL 1419338, at *2 (2d Cir. May 16, 2025) (summary order).  Under 20 C.F.R. § 416.920c, "the ALJ [is] not required to give special deference to the opinion of [Plaintiff's] treating physician." *Rushford v. Kijakazi*, No. 23-317, 2023 WL 8946622, at *1 (2d Cir. Dec. 28, 2023).  "Instead, the ALJ was only obliged to consider the submitted medical opinions based on several factors set forth in the regulations and to explain how the two 'most important' factors – supportability and consistency – applied to each opinion." *Id.*; *see also Wickham*, 2025 WL 1419338, at *2 (explaining that 20 C.F.R. § 416.920c "requires the ALJ to consider supportability and consistency when evaluating the weight to give a medical opinion").  "Specifically, the 'more relevant the objective medical evidence and

supporting explanations' underlying the medical opinion, the more persuasive the medical opinion should be." *Wickham*, 2025 WL 1419338, at *2 (citing 20 C.F.R. § 416.920c(c)(1)). "And the 'more consistent a medical opinion[ ] . . . is with the evidence from other medical sources and nonmedical sources in the claim,' the more persuasive the medical opinion should be." *Id.* (citing § 416.920c(c)(2)) (internal alteration included).

### A. Consultative Examinations

"A consultative examination is used to 'try to resolve an inconsistency in the evidence, or when the evidence as a whole is insufficient to allow [the ALJ] to make a determination or decision' on the claim." *Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 32 (2d Cir. 2013) (citing 20 C.F.R. §§ 404.1519a(b), 416.919a(b)). "It can be reversible error for an ALJ not to order a consultative examination when an examination is required for an informed decision." *Id.* (citing *Falcon v. Apfel*, 88 F. Supp.2d 87, 91 (W.D.N.Y. 2000)). "However, an ALJ is not required to order a consultative examination if the facts do not warrant or suggest the need for it." *Id.* (citations omitted). Ultimately, "the decision whether to seek the opinion of a medical expert is discretionary." *Falco v. Comm'r of Soc. Sec.*, No. 21-CV-02999 (JS), 2025 WL 510061, at *9 (E.D.N.Y. Feb. 14, 2025) (citing *Lupo v. Saul*, No. 17-CV-1722 (JMA), 2020 WL 6873438, at *10 (E.D.N.Y. Nov. 23, 2020)).

SSA regulations provide that an ALJ "may require a consultative examination" when needed to "resolve an inconsistency in the evidence" or if "the evidence as a whole is insufficient to allow [them] to make a [disability] determination." 20 CFR

§ 404.1519a(b). Two examples provided in the SSA's regulations are: (1) "The additional evidence needed is not contained in the records of [a claimant's] medical sources;" or (2) "There is an indication of a change in [a claimant's] condition that is likely to affect [their] ability to work, but the current severity of [their] impairment is not established." 20 CFR § 404.1519a(b)(1), (4).

In the end, "[n]othing in the regulation indicates that an ALJ's ultimate determination of disability or assessment of RFC must comport with a specific medical opinion." *Rubin v. Martin O'Malley, Comm'r of Soc. Sec.*, 116 F.4th 145, 155 (2d Cir. 2024). However, "it is [ ] not insignificant" when "the record does not include a medical opinion concluding that [a claimant] can perform substantial gainful work." *Id.* at 156.

### B. The ALJ's Assessment of the Medical Opinions

The ALJ found Dr. Aguiar's opinions "unpersuasive because they are inconsistent with h[er] consultative examination findings." A.R. 22. The ALJ was not persuaded by Dr. Aguiar's opinions addressing Plaintiff's physical limitations. The ALJ explained: "Marked limitations are not supported by normal ambulation skills, full muscle strength in the claimant's bilateral upper and lower extremities and hand and finger dexterity, [and] [t]hey [are] also inconsistent with the relatively benign physical findings of the claimant's treating providers and do not rise to a marked level." A.R. 22.

After finding Dr. Aguiar's opinions unpersuasive, the ALJ then denied Plaintiff's request for another consultative examination or medical expert opinion.

A.R. 22–23.  The ALJ reasoned that, although Plaintiff's request was based on Dr. Aguiar's opinion from the first examination that Plaintiff had a marked limitation for performing manipulative activities with his right upper extremity, Dr. Aguiar's opinion was "unsupported by the examiner's own clinical findings" where Plaintiff's "hand and finger dexterity was noted to be intact with 5/5 grip strength on the left and 4/5 on the right, he was able to zip, button, and tie and although sensory deficit was noted on the right, strength was 5/5 in the upper [] extremities." A.R. 23 (citing A.R. 416–18).  The ALJ further relied on the fact that, during Plaintiff's second examination with Dr. Aguiar more than six months later, Plaintiff was noted to have "full muscle strength in the bilateral upper extremities with no sensory deficit noted, no muscle atrophy, intact hand and finger dexterity and full grip strength bilaterally." A.R. 23 (citing A.R. 423–26).

The ALJ then found the non-examining consultants' opinions that Plaintiff possessed an RFC at the light exertion level to be persuasive due to "the totality of the claimant's impairments, physical examination findings, and hearing testimony." A.R. 23.  However, the ALJ ultimately assessed Plaintiff to have an RFC at the sedentary exertion level after giving him "the benefit of the doubt." A.R. 23.  Last, the ALJ cited Plaintiff's December 2019 MRI of his cervical and thoracic spine, Plaintiff's statements that he watches his four-year-old child every day while his wife works, and a few of Dr. Aguiar's observations during Plaintiff's second examination. A.R. 23.

Even though none of Plaintiff's treating physicians submitted a medical source statement, such statements were not necessarily required because "[t]he Second Circuit has held that the absence of a medical source statement from a treating provider does not require remand where 'the record contains sufficient evidence from which an ALJ can assess the petitioner's residual functional capacity.'" *Marinix R. v. Comm'r of Soc. Sec.*, No. 23-CV-08071 (GRJ), 2024 WL 4579477, at *5 (S.D.N.Y. Oct. 25, 2024) (quoting *Tankisi*, 521 F. App'x at 33–34 ).  And, despite Plaintiff's contention, the ALJ did not *inherently* err by finding the non-examining physicians, Drs. Cincore and Pradhan, more persuasive than the examining physician, Dr. Aguiar.  *See Parent v. O'Malley*, No. 23-917, 2024 WL 3342463 *2 (2d Cir. July 9, 2024) (summary order) (finding the ALJ did not act improperly when concluding that the non-examining consultants' opinions were more persuasive than the examining consultant's opinions).  However, the Court is also mindful that "[t]he opinion of a non-examining physician cannot constitute substantial evidence on its own and as such should not be heavily relied upon by an ALJ." *Fintz v. Kijakazi*, No. 22-CV-00337 (KAM), 2023 WL 2974132, at *6 (E.D.N.Y. Apr. 15, 2023) (citing *Avila v. Comm'r of Soc. Sec. Admin.*, No. 20-CV-1360 (ER) (DF), 2021 WL 3774317, at *20 (S.D.N.Y. Aug. 9, 2021)).

## C. Development of the Record

The Court now turns to the Plaintiff's claim that the ALJ failed to sufficiently develop the record.  Plaintiff argues that "[i]f the ALJ was genuinely concerned that Dr. Aguiar's RFC assessment was inconsistent with the clinical findings, she could

readily have reached out to her for clarification." P. Mot. at 13. In the alternative, Plaintiff claims that the ALJ "could have ordered a consultative examination to be conducted by another physician, or she might have obtained testimony of a physician . . . to address Dr. Aguiar's RFC assessment." *Id.* at 13–14. The Court agrees and finds that the ALJ's failure to do so before assessing the supportability and consistency of Dr. Aguiar's medical opinions requires a remand.

In reviewing a final decision of the Commissioner, a court must determine whether the ALJ "fully and completely" developed the record. *Ajibose v. Colvin*, No. 15-CV-03346 (PKC), 2016 WL 8711342, at *7 (E.D.N.Y. Sept. 30, 2016) (citation omitted); *see also Echevarria v. Sec'y of Health & Hum. Servs.*, 685 F.2d 751, 755 (2d Cir. 1982) (noting that "the ALJ, unlike a judge in a trial, must himself affirmatively develop the record," and emphasizing that reviewing courts must determine that record was fully developed before evaluating whether "substantial evidence" supported the ALJ's decision). The ALJ has an affirmative duty to develop the record even when the plaintiff is represented by counsel. *See Chapman v. Comm'r of Soc. Sec.*, No. 19-CV-1873 (PKC), 2020 WL 5763629, at *3 (E.D.N.Y. Sept. 27, 2020) (citing *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009)). And even if a plaintiff's counsel represents to an ALJ that the record is complete, an ALJ still has an affirmative duty to develop the record. *See Weiss v. Comm'r of Soc. Sec.*, No. 19-CV-5916 (MKB), 2021 WL 2010503, at *14 n.8 (E.D.N.Y. Mar. 23, 2021). Further, "the Court must independently consider whether the ALJ failed to satisfy his duty to develop the record." *Prieto v. Comm'r of Soc. Sec.*, No. 20-CV-3941 (RWL), 2021 WL 3475625, at

*10 (S.D.N.Y. Aug. 6, 2021) (citing *Sanchez v. Saul*, No. 18-CV-12102, 2020 WL 2951884, at *23 (S.D.N.Y. Jan. 13, 2020)).

"While a disability benefits claimant bears the burden of proof as to her claim, and must provide to the Commissioner evidence supporting it, the special character of these proceedings requires the Commissioner to shoulder responsibility by 'investigat[ing] the facts and develop[ing] the arguments both for and against granting benefits.'" *Worasutthayangkoon v. Comm'r of Soc. Sec.*, No. 16-CV-4772 (ENV), 2020 WL 13861627, at *7 (E.D.N.Y. Oct. 8, 2020) (quoting *Sims v. Apfel*, 530 U.S. 103, 110–11 (2000)) (internal alterations included).

An ALJ "is under no such obligation to recontact treating sources or order consultive examinations as long as she could reasonably make a determination based upon the evidence already presented." *Falco*, 2025 WL 510061, at *9 (citing *Lupo*, 2020 WL 6873438, at *10; 20 C.F.R. § 404.1513a(b)(2); 20 C.F.R. § 404.1520b). On the other hand, "where there are deficiencies in the record," an ALJ has an "affirmative obligation to develop a claimant's medical history." *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999). This includes an affirmative duty to recontact a medical expert if an ALJ makes an initial determination that a medical expert's opinions are vague or appear to be inconsistent with their examination notes. *See Beckman v. Com'r of Soc. Sec.*, No. 21-CV-1492 (PKC), 2022 WL 4451041, at *3–4 (E.D.N.Y. Sept. 23, 2022); *see also Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir. 1998) (finding that, "even if the clinical findings were inadequate, it was the ALJ's duty to seek additional information from" a treating physician).

### 1. *Plaintiff's Right Upper Extremity Limitations*

Plaintiff's request at the SSA hearing for the ALJ to clarify Plaintiff's physical limitations, either by recontacting Dr. Aguiar or ordering a new consultative examination, was not unreasonable. Plaintiff specifically cited uncertainty whether he could more than "occasionally" use his right hand for all manipulations. A.R. 49. The ALJ stated that she would take Plaintiff's request "under advisement" but later declined to order another examination or recontact Dr. Aguiar. A.R. 50. Although ALJs are not always obligated to grant such requests, here, the uncertainty as to Plaintiff's manipulative abilities with his right upper extremity was clear. Clarifying Plaintiff's abilities with his right upper extremity was especially important because it was dispositive for determining Plaintiff's disability where the VE testified that Plaintiff could not perform his past relevant work as a detective if he was limited to only occasional use of his right hand, reasoning that "with computers nowadays [employment as a detective] would require at least frequent reaching, handling, and fingering." A.R. 48.

Instead of recontacting Dr. Aguiar or obtaining a second opinion, the ALJ found Dr. Aguiar's opinions to be "unpersuasive because they are inconsistent with [her] consultative examination findings" and also "inconsistent with the relatively benign physical findings of [Plaintiff's] treating providers." A.R. 22. However, the Court finds that Dr. Aguiar's opinions were not necessarily inconsistent or unsupported with her own findings or with Plaintiff's other treatment records.

Dr. Aguiar's concerns for Plaintiff's manipulative abilities with his right upper extremity were supported by Plaintiff's recent reports to physicians that he was experiencing limb pain, right upper extremity pain, and a burning sensation down his arm.  *See* A.R. 320, 324, 441, 442, 430.  And they were also not necessarily inconsistent with Dr. Aguiar's own findings where, following both consultative examinations, Dr. Aguiar reported Plaintiff to have reduced range of motion in his cervical spine and shoulders.  *See* A.R. 418, 425.

Although Dr. Aguiar did not form an opinion as to *all* of Plaintiff's manipulative abilities with his right upper extremity, Dr. Aguiar did discuss this topic, in part, by opining that during Plaintiff's first examination he had a marked limitation for "grasping, holding and handling objects with the right hand" (later finding no limitation in that area during the second examination) and also opining that Plaintiff had a moderate limitation for "reaching overhead" during the second examination (after not noting any limitation during the first examination).  A.R. 419, 426.  However, Dr. Aguiar did not address Plaintiff's limitations for full directional reaching or fingering during either examination.[4]  By recontacting Dr. Aguiar, the ALJ could have inquired as to why she found that Plaintiff's marked limitation for "grasping, holding, and handling objectives with his right hand" was no longer

---

[4] The Court also notes that non-examining medical consultant, Dr. Cincore, found Plaintiff to have limitations reaching with his right arm overhead, and also "in front and/or laterally."  A.R. 61.  But six months later, the second non-examining medical consultant, Dr. Pradhan, did not have the same concern following their review of the record.  A.R. 79.

present during the second examination and also why she found Plaintiff had developed a moderate limitation for "reaching overhead." A.R. 419, 426. The ALJ could have also sought Dr. Aguiar's opinion as to Plaintiff's specific limitations for each type of manipulation. Again, these were not *de minimis* questions; explanations and clarifications as to Plaintiff's evolving limitations with his right upper extremity were highly relevant to determining whether he could perform sedentary work at a computer, like his past work as a detective, involving frequent "reaching, handling, and fingering." A.R. 48.

It is also notable that Dr. Aguiar's diagnoses relating to Plaintiff's right upper extremity also changed significantly between the two examinations: during the first examination, she diagnosed neck pain, upper back pain, right extremity pain, right hand and finger pain, yet during the second examination, she only diagnosed lower back pain. A.R. 419, 426. The ALJ could have requested an explanation for these significant changes between the two examinations, which were only separated by six months.

In this instance, the ALJ had a duty to resolve the potential inconsistencies in an opinion from a medical expert who had actually examined the Plaintiff. *See Beckman*, 2022 WL 4451041, at *4 (finding that the ALJ had a duty to develop the record and "reconcile" gaps after the ALJ found inconsistencies in the examining physicians' opinions). It is certainly true that ALJs need not always recontact physicians if there is a discrepancy or perceived inconsistency in their report(s). *See e.g.*, *Calicchio v. Comm'r of Soc. Sec.*, No. 24-CV-01065 (NCM), 2025 WL 1489763, at

*14 (E.D.N.Y. May 23, 2025) (affirming the ALJ's decision after finding that the ALJ adequately developed the record, despite rejecting plaintiff's request at the SSA hearing to order further consultative examinations, as there was no inconsistency, gap, or ambiguity in the record preventing the ALJ from adequately addressing the plaintiff's RFC. Here, however, both of Dr. Aguiar's examinations noted considerable limitations on Plaintiff's ability to complete tasks with his right upper extremities. A.R. 419, 426. This finding is directly relevant to the RFC, and there was no examining physician gave a contrary opinion. Yet the ALJ failed to adequately develop the record by simply recontacting Dr. Aguiar or obtaining another evaluator's opinion.

## 2. *Plaintiff's Limitations for Prolonged Walking, Standing, and Sitting*

The ALJ was also required to resolve any perceived inconsistencies regarding Plaintiff's limitations for walking, standing, and sitting. During both examinations, Dr. Aguiar opined that Plaintiff had marked limitations for prolonged standing and prolonged walking. A.R. 419, 426. During the first examination, Dr. Aguiar did not note any limitation for prolonged sitting, but, during the second examination, she did note a marked limitation in that area. A.R. 419, 429. The ALJ found Dr. Aguiar's opinions regarding Plaintiff's limitations unpersuasive, reasoning that "[m]arked limitations are not supported by normal ambulation skills, full muscle strength in the claimant's bilateral upper and lower extremities . . . ," and then determined that,

33

during an eight-hour workday with normal breaks, Plaintiff had the ability to walk for 1 hour, stand for 1 hour, and sit for 6 hours.  A.R. 22, 18.

The Court finds that Dr. Aguiar's opinions as to Plaintiff's ability to walk, stand, or sit for prolonged periods were, again, not necessarily inconsistent with or unsupported by her own findings or Plaintiff's other treatment records, and it was error to dismiss them as such.

The ALJ concluded that Plaintiff was capable of performing sedentary work with only some added restrictions.  A.R. 18.  Importantly, while performing his past relevant work as a detective, which the ALJ and VE found to be "sedentary work" as actually performed, Plaintiff was still required to sit for up to six hours and stand or walk for up to another hour during an eight-hour workday.[5]  These exertion levels matched Plaintiff's testimony that his prior job as a financial crimes investigator for the New York Police Department required him to sit for six or seven hours and walk for about an hour throughout an eight-hour workday.  *See* A.R. 35–36.

Dr. Aguiar's observations that Plaintiff had improving, or even normal, strength, dexterity, or senses in the upper extremities, does not necessarily lead to a

---

[5] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met."  20 CFR § 404.1567(a).  "'Occasionally' means occurring from very little up to one-third of the time, and would generally total no more than about 2 hours of an 8-hour workday.  Sitting would generally total about 6 hours of an 8-hour workday."  SSR 96-9p, 61 Fed. Reg. 34478, 34480 (July 2, 1996).

conclusion that Dr. Aguiar's opinions as to Plaintiff's marked limitations for prolonged sitting, standing, or walking are unsupported or inconsistent. The ALJ failed to adequately consider how Dr. Aguiar's second medical source statement was supported by Plaintiff's testimony at the SSA hearing that he can walk for "not even two blocks," stand for "maybe close to half an hour" and sit for "maybe half an hour" before needing to lie down because his back pain becomes "unbearable." *See* A.R. 40–41. Importantly, Dr. Aguiar's opinion was also consistent with Plaintiff's testimony that his syringomyelia was causing severe pain and burning sensations down his right side. *See* A.R. 39.

Plaintiff's treatment records during that time also reflected severe and increasing levels of pain that may have limited his ability to walk, stand, or sit. Such records include: (1) a May 2020 telehealth call with his primary care physician, Dr. Gecht, where Plaintiff reported experiencing moderate back and limb pain, *see* A.R. 324; (2) May 2021 and January 2022 telehealth visits with his pulmonologist, Dr. Elsayegh, where Plaintiff reported suffering from, *inter alia*, neck pain, leg weakness, and right upper extremity weakness, *see* A.R. 430, 442; and (3) a June 2021 telehealth visit with his neurologist, Dr. El-Sherif, where Plaintiff reported recently experiencing daily gait imbalance, increasing pain in his neck and extremities, a burning sensation down his arm, and difficulty with prolonged standing due to right leg pain, *see* A.R. 441. These records supported Plaintiff's testimony at the SSA hearing that his syringomyelia was causing increasing levels of pain and further

35

limiting his physical abilities, such as his ability to walk, stand, or sit. *See* A.R. 40–41.

Dr. Aguiar's opinions were also not necessarily inconsistent with, or unsupported by, her own treatment notes. While Dr. Aguiar did observe Plaintiff to have normal ambulation function and strength in his extremities during both visits, she also diagnosed Plaintiff with neck pain, upper back pain, right upper extremity pain, and imbalance during the first examination. And although she did not diagnose those same conditions during the second examination, Dr. Aguiar later diagnosed Plaintiff with lower back pain and dizziness. A.R. 419, 426. Although the diagnoses changed between the first and second examinations, both reports still expressed concerns as to Plaintiff's ability to walk, stand, or sit — as evidenced by her opinions that Plaintiff had a marked limitation for standing and walking during both examinations and an additional marked limitation for sitting during the second examination. A.R. 419, 426. The Court does not find that it is *per se* inconsistent for Plaintiff to have had normal ambulation and strength in his extremities, while still having marked limitations in walking, sitting, or standing. And to the extent the ALJ believed otherwise, she had a duty to have Dr. Aguiar or another consulting expert address that issue directly.

Thus, even if Dr. Aguiar's opinions as to Plaintiff's limitations for prolonged walking, standing, and sitting were inconsistent with her other opinions, this inconsistency could have been explained by recontacting Dr. Aguiar. Instead, the ALJ prematurely found Dr. Aguiar's opinions to be unpersuasive. As a result, it is

36

not clear from the ALJ's decision whether the determination of Dr. Aguiar's consistency and supportability was reasonable.

### D. Remand is Necessary for the ALJ to Develop the Record

Because Dr. Aguiar was the *only* examining source who provided an opinion as to Plaintiff's physical limitations, the ALJ had a heightened duty to resolve any perceived inconsistencies within Dr. Aguiar's reports before determining whether Plaintiff's physical limitations would allow Plaintiff to perform all of the duties required in his previous position as a detective. The Court is mindful that "the duty to develop the record does not extend to all inconsistencies in a record," but it does "extend to those [inconsistencies] which constitute 'obvious gaps' in the record." *Fintz*, 2023 WL 2974132, at *7 (citing *Beckman*, 2022 WL 4451041 at *4).

Here, by failing to investigate or resolve her own significant concerns regarding Dr. Aguiar's opinions, "the ALJ failed to develop obvious 'gaps' in the record, which requires a remand." *Daniela B. v. Kijazaki*, 675 F. Supp. 3d 305, 318 (E.D.N.Y. 2023) (citing *Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980)); *see also e.g.*, *Derwin L. v. Comm'r of Soc. Sec.*, No. 24-CV-05293 (GRJ), 2025 WL 1092838, at *5 (S.D.N.Y. Apr. 11, 2025) (remanding for further administrative proceedings after finding "[t]he ALJ should have re-contacted the treating providers and sought functional assessments and considered whether updated consultative examinations were necessary"); *Paula D. v. O'Malley*, No. 23-CV-972 (VAB), 2024 WL 3520333, at *7–9 (D. Conn. July 23, 2024) (remanding after finding the ALJ "had an obligation to investigate" perceived inconsistencies in the medical record but erred by not eliciting "more evidence, in

37

order to resolve the inconsistencies and make a supported decision"); *Poceous v. Comm'r of Soc. Sec.*, No. 20-CV-4870 (JS), 2024 WL 3029197, at *15 (E.D.N.Y. June 17, 2024) (remanding for further proceedings "since the ALJ's reasoning for weighing the medical opinions in the record is abundantly unclear to the Court, and the ALJ did not specifically explain why Plaintiff's statements regarding the pain she endured when sitting, standing and walking were not entirely consistent with the medical evidence and other evidence in the record"); *Protentis v. Comm'r of Soc. Sec.*, No. 23-CV-3114 (JRC), 2024 WL 1367958, at *8 (E.D.N.Y. Mar. 31, 2024) (finding the ALJ did not fulfil their duty to develop the record where the ALJ rejected the treating physician's opinion as inconsistent with the record but then made no attempt to contact said physician); *Lori S. v. O'Malley*, 727 F. Supp. 3d 78, 83 (D. Conn. 2024) (remanding after concluding that "the ALJ formulated his decision based on an incomplete record" where, after noting inconsistencies between treating sources opinions and their notes, the ALJ failed to contact them to "reconcile his or her opinion with his or her notes"); *Cheryl W. v. Kijakazi*, No. 22-CV-1476 (VAB), 2024 WL 1012923, at *5 (D. Conn. Mar. 8, 2024) (remanding for "further development or more specific findings" after finding the record "does not contain any indication that the ALJ contacted [the consultative examiner] to reconcile this alleged inconsistency in his report").

Accordingly, "the ALJ should, on remand, provide a comprehensive explanation of the opinions' supportability and consistency, as well as the other factors required by the regulations." *See Pinnock v. Comm'r of Soc. Sec.*, No. 22-CV-

38

6858 (AMD), 2024 WL 1308597, at *9 (E.D.N.Y. Mar. 27, 2024) (internal citation omitted).

With a record that is not fully developed, the Court cannot yet determine whether the disputed RFC is supported by substantial evidence. The Court need not answer that question until the ALJ more fully develops the record on remand. *See Kelly v. Comm'r of Soc. Sec.*, No. 20-CV-5318 (JS), 2024 WL 5120051, at *13 (E.D.N.Y. Dec. 16, 2024); *see also Rodriguez v. Comm'r of Soc. Sec. Admin.*, No. 24-CV-00167 (NCM), 2025 WL 660265, at *3 (E.D.N.Y. Feb. 28, 2025). "Failing to adequately develop the record is an independent ground for vacating the ALJ's decision and remanding for further findings." *Diano v. Comm'r of Soc. Sec.*, No. 19-CV-2265 (MKB), 2020 WL 13555076, at *16 (E.D.N.Y. Dec. 2, 2020) (citing *Rosa*, 168 F.3d at 83).

## CONCLUSION

For the reasons outlined herein, the Court grants Plaintiff's motion for judgment on the pleadings and denies the Commissioner's cross-motion. The Commissioner's decision is remanded for further consideration consistent with this opinion.

SO ORDERED.

*/s/ Nina R. Morrison*
NINA R. MORRISON
United States District Judge

Dated:      November 21, 2025
            Brooklyn, New York